McCLISH (BROADWELL v.). See Case No. 1,911.

## Case No. 8,701.

McCLOSKEY et al. v. The ACHILLES et al.

[34 Leg. Int. 384; 13 Phila. 463; 5 N. Y. Wkly. Dig. 241; 4 Law & Eq. Rep. 676; 23 Int. Rev. Rec. 368; 10 Chi. Leg. News, 73; 25 Pittsb. Leg. J. 49.] [1]

Circuit Court, E. D. Pennsylvania. Oct. 22, 1877.

COLLISION—VESSEL AT ANCHOR—MEASURE OF DAMAGES—VALUE OF VESSEL.

1. A schooner, while at anchor, with the proper lights up. was run into and sunk by a steamship. *Held*, that the steamship was liable for the loss.

2. The measure of damage or value of the vessel is what price a prudent owner. wishing but not compelled to sell. would reasonably expect to get, within a reasonable time, at public or private sale, without forcing the sale. and using proper measures to avoid undue sacrifice.

[Appeal from the district court of the United States for the Eastern district of Pennsylvania.]

[This was a libel by James McCloskey and others, owners of the schooner Marian Gage, against the steamship Achilles and others, for damages sustained in a collision.]

Henry R. Edmunds, Henry Flander, and George P. Rich, for libellants.

Thomas Hart, Jr., for respondents.

McKENNAN, Circuit Judge. The only issue in this case is one of fact. If the material facts alleged in the libel are sufficiently supported by the proofs, the culpability of the respondent's vessel is clear, and her liability for the loss complained of necessarily follows. It appears from the evidence that on Tuesday, August 24th, 1875, the schooner Marian Gage, of Philadelphia, owned by the libellants, left Philadelphia for Boston, with a cargo of 480 tons of coal. In the evening of that day she came to anchor between Gloucester and Horseshoe buoy, and remained there during the night. On Wednesday she resumed her voyage, and in the evening anchored in about four fathoms of water just below "Miah Maull" buoy, in the Delaware Bay. The weather being threatening, she remained at anchor at the same place until about three o'clock in the morning of Saturday, August 28th, 1875, when she was run into and sunk by the steamer Achilles, the respondent, which was then on

---

[1] [Reported from 34 Leg. Int. 384. by permission. 5 N. Y. Wkly. Dig. 241. and 4 Law & Eq. Rep. 676, contain only partial reports.]

a return voyage from Newburyport to Philadelphia, and was light. At the time of the collision the wind was about northeast, the tide about slack, and the weather cloudy and hazy, not thick and not clear, but unfavorable for seeing distant objects. The schooner was struck on the starboard side, about the forward part of her fore-rigging, and sunk almost immediately, leaving the men on her, time only to escape with their lives, without any of their personal effects. At the time of the collision the steamer was running at full speed, from eight to ten knots an hour, under steam, and with her sails set, and was approaching Miah Maull shoal to verify her position. A proper anchor light was placed on the schooner, and it was burning until extinguished by the collision. This light was probably seen by a seaman on the steamer when he was coming down from her rigging, but it, as well as the hull of the schooner, ought to have been seen by the steamer's lookout, if he had observed proper vigilance, when the vessels were far enough from each other to avoid collision.

Under this state of facts, which is, I think, fully established by the proofs, it needs no argument to show that the fault of the collision rested solely on the steamer. The schooner was at anchor, and had omitted no duty required of her, under such circumstances, at least nothing that she omitted to do contributed, in any way, to the loss complained of. The steamer was under full headway, had the control of her own course and movements, and ought to have kept out of the schooner's way. This she would doubtless have done if the schooner had been sighted in due time by the steamer's lookout. To the insufficiency of this lookout I think it is clear the collision is attributable, and the fault is, therefore, entirely upon the steamer.

In determining the value of the sunken vessel the court below applied a just and proper standard of estimation. The proofs of the market value of similar vessels vary in amount from $10,000 to $22,000, according to the different circumstances under which they were sold. But as the court said, "the true question is, what price a prudent owner, wishing but not compelled to sell, would reasonably expect to get, and would probably be able to get, within a reasonable time, at public or private sale, without forcing the sale, and using proper measures to avoid undue sacrifice." Thus measured the value of the vessel was fixed at $17,500, which, with interest to the date of the decree, and the nett freight, amounted to $18,657.45. Deducting from this $180.56, the nett value of certain materials obtained by the libellants from the Marian Gage, there was left the sum of $18,476.89 to be paid by the respondent. That sum to wit, $18,476.89, with interest from July 11th, 1876, and costs, it is here ordered, adjudged and decreed, be paid by the respondent to the libellants.